**David Rasheed ALI**

v.

**William B. STEPHENS**

**CIVIL ACTION NO. 9:09–CV–52**

United States District Court,
E.D. Texas, Lufkin Division.

Signed September 26, 2014

Eric M. Albritton, Michael A. Benefield, Shawn A. Latchford, Albritton Law Firm, Longview, TX, for David Rasheed Ali.

Celamaine Cunniff, Attorney General's Office, Leah Jean O'Leary, Office of the Attorney General, Patrick Pope, Austin, TX, for William Stephens.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

ZACK HAWTHORN, United States Magistrate Judge

Plaintiff David Rasheed Ali, an inmate currently confined at the Michael Unit of the Texas Department of Criminal Justice, Correctional Institutions Division (TDCJ–CID), filed this civil rights action pursuant to the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), 42 U.S.C. § 2000cc, against the Director of TDCJ–CID. The Plaintiff challenges prison policies that prohibit him from wearing a fist-length beard [1] and from wearing religious head wear, specifically a Kufi, throughout the prison facility. The Defendant contends that the grooming and religious head wear policies are the least restrictive means of furthering the compelling interests of the Texas Department of Criminal Justice (TDCJ) in maintaining safety and security in the prisons, as well as operating within its budget. Trial Transcript (Tr.), Vol. 1 at 30.

On January 17, 2014, pursuant to the written consent of all parties, this case was referred to the undersigned United States Magistrate Judge for trial and entry of judgment. The case proceeded to a five-day bench trial before this court. Pursuant to Federal Rule of Civil Procedure 52, the court announces and adopts the following final findings of fact and conclusions of law.

### Findings of Fact

(1)  At the time he filed this lawsuit, the Plaintiff was an inmate at the Eastham Unit of the TDCJ–CID. The Plaintiff was transferred to the Michael Unit of TDCJ–CID while this lawsuit was pending.

(2)  The Michael Unit is a maximum security prison that can house 3,304 inmates. Tr. Vol. 2 at 510.

(3)  The Plaintiff is currently assigned to live in a dormitory in the trusty camp outside the gates at the Michael Unit of TDCJ–CID. Tr. Vol. 2 at 412, 428, 450.

---

1.  In his complaint, the Plaintiff asserts that a fist-length beard is 3–4 inches in length. On February 4, 2014, the court enjoined the Defendant from enforcing the grooming policy to the extent that it prohibited the Plaintiff from wearing and maintaining a quarter-inch beard. At trial, the Plaintiff testified that a quarter-inch beard is unacceptable according to his religious beliefs, and that he is no longer asking for a quarter-inch beard. Tr. Vol. 2 at 422–23, 476.

The Plaintiff has essentially waived any claim concerning wearing a quarter-inch beard. Because he does not have a sincere religious belief that he is required to maintain a quarter-inch beard, he has failed to meet the first prong of the RLUIPA analysis.

(4) The custody levels in TDCJ range from G–1 through G–5 for general population and from Level 1 through Level 3 for administrative segregation. Tr. Vol. 1 at 161.

(5) Trusties have the lowest TDCJ custody classification. Tr. Vol. 2 at 536. Their classification is G–1, which means that they can be supervised by indirect supervision. Tr. Vol. 3 at 544.

(6) The Plaintiff works in the law library inside the gates at the Michael Unit. Tr. Vol. 2 at 450. On a typical workday, the Plaintiff might be searched ten times in one day, if he delivers legal materials to inmates in administrative segregation. Tr. Vol. 2 at 455–56. Some of the searches are strip searches and some are pat searches. Tr. Vol. 2 at 450–56.

(7) The Plaintiff is a Sunni Muslim, who follows the Hanafi school of Sunni law. Tr. Vol. 1 at 46, 49; Tr. Vol. 2 at 416–17.

(8) The Hanafi school of Islam requires men to wear a beard. The Hanafi school teaches that it is permissible for Muslim men to trim the mustache area, but it is considered a sin to trim the beard shorter than fist-length. Tr. Vol. 1 at 50, 53.

(9) There are some Hanafi scholars who believe it is a recommended act of piety to wear a Kufi at all times, which will be rewarded by God. Tr. Vol. 1 at 55. The Plaintiff's Kufi is a white, seamless, knit cap with small holes. Tr. Vol. 1 at 100; Tr. Vol. 2 at 427; Tr. Vol. 3 at 603; Pl. Ex. 119.

(10) The Plaintiff seeks religious counsel from Sadiq Ahmed, an Islamic scholar, and his students. Tr. Vol. 2 at 416. Those scholars have advised the Plaintiff that he has an obligation to wear a fist-length beard and an obligation to wear a Kufi at all times. Tr. Vol. 2 at 419–21.

(11) The Plaintiff sincerely believes that he must wear a Kufi at all times and he must wear a fist-length beard, and that his failure to comply with these obligations constitutes a sin. Tr. Vol. 2 at 421–22. The Plaintiff believes that being able to practice his religion by having a fist-length beard and wearing a Kufi throughout the prison facility will help him repent for his sins. Tr. Vol. 2 at 426.

(12) The Plaintiff has a Kufi and a prayer rug. Def. Ex. 43. The Plaintiff is currently allowed to carry his prayer rug and Kufi from the trusty camp to religious services held inside the facility. Services are typically held once a week and daily during the month of Ramadan. The prayer rug and Kufi are searched when the Plaintiff brings them through the back gate of the Michael Unit. Tr. Vol. 2 at 428.

(13) TDCJ does not provide religious items to inmates cost-free. Tr. Vol. 3 at 642–43; Pl. Ex. 45. An inmate who wants a religious item must send a request to the chaplain. If the request is approved, the inmate will be allowed to purchase the item in the commissary or receive it from an outside source. The chaplain takes the item to the property officer who issues a property slip for the item and then gives the item to the inmate. Tr. Vol. 3 at 642.

(14) The chaplain's office maintains records concerning the religious preferences of inmates. Tr. Vol. 3 at 587. If a correctional officer thinks that an inmate carrying a Kufi is not Muslim, the officer will stop the inmate and call the chaplain's office to see if the inmate is authorized to have a Kufi. Tr. Vol. 3 at 585–87.

(15) The property papers maintained by TDCJ document that an inmate has a Kufi. Tr. Vol. 3 at 587–88. Inmates are issued property slips that they can carry on their person to document their ownership of certain items of property, such as watches. Tr. Vol. 3 at 607.

(16) Some inmates are permitted to wear hats, depending on their work assignments. Tr. Vol. 2 at 243–47; Pl. Ex. 117; Def. Ex. 82.

(17) The TDCJ grooming policy does not allow inmates to have a beard or mustache. Some inmates are permitted to shave with clippers. Inmates who do not follow the grooming standards are subject to disciplinary action. Tr. Vol. 1 at 197; Pl. Ex. 55; Def. Ex. 2.

(18) It costs TDCJ $46.32 to process one disciplinary case. Tr. Vol. 2 at 410. In 2012, male inmates in TDCJ were found guilty of 6,568 disciplinary cases for violations of the grooming standards. Pl. Ex. 72; Def. Ex. 23.

(19) Most inmates comply with TDCJ's grooming standards, at least in part, because it is very hot in TDCJ's prisons, except during the winter. Tr. Vol. 3 at 578–79, 582.

(20) A clipper shave pass is a piece of paper issued by a medical provider to allow an inmate with certain medical conditions to shave with clippers. Tr. Vol. 3 at 614–15, 628; Pl. Ex. 89; Def. Ex. 7. As of February 26, 2014, there were 6,615 inmates in TDCJ with clipper shave passes. Tr. Vol. 3 at 616; Pl. Ex. 74.

(21) Inmates with clipper shave passes go to the barbershop where they are given clippers to shave their own faces. Tr. Vol. 3 at 617. A fresh clipper shave will leave some stubble, but gives a fairly clean-shaven appearance. Tr. Vol. 3 at 617. The maximum beard length for an inmate with a clipper shave pass is a quarter inch. Tr. Vol. 3 at 615–16; Pl. Ex. 89.

(22) There are two sets of clippers in the barbershops. One pair is for the barber and one pair is for inmates with clipper shave passes. Tr. Vol. 2 at 494–95.

(23) To maintain a quarter-inch beard, the Plaintiff goes to the barbershop every two weeks to use the clippers. Tr. Vol. 2 at 468. The Plaintiff trims his beard himself, using the clippers with a blade. Tr. Vol. 2 at 494. To maintain a fist-length beard, the Plaintiff would clasp his hand around the beard and use the clippers without a blade to trim it. Tr. Vol. 2 at 495.

(24) Inmates who are classified as G–1, G–2, and G–3 are allowed to go to the barbershop by themselves. Tr. Vol. 3 at 571. G–4, G–5, and administrative segregation inmates must be escorted to the barbershop by correctional officer. Tr. Vol. 3 at 571. At the Michael Unit, there are 265 G–4 inmates, 91 G–5 inmates, and 452 inmates in administrative segregation. Tr. Vol. 3 at 571; Def. Ex. 20.

(25) As of January 31, 2014, there were 150,935 inmates confined in TDCJ and private prisons in Texas. Tr. Vol. 1 at 83; Tr. Vol. 4 at 1096; Plaintiff's Ex. 71. Private prisons are operated by private correctional vendors, but TDCJ owns the facility itself. Tr. Vol. 4 at 1096.

(26) Approximately 8 percent of TDCJ's inmate population is female. Tr. Vol. 1 at 84.

(27) Female inmates commit the same disciplinary infractions as men, but at a slightly lower rate on a per capita basis. Def. Ex. 22.

(28) As of January 2014, there were 6,446 male inmates who identified themselves as Muslim, or approximately 4.6 percent of the male population in TDCJ. Tr. Vol. 2 at 87–88; Defendant's Ex. 19.

(29) There are 3,281 inmates at the Michael Unit. Tr. Vol. 2 at 530; Def. Ex. 12.

(30) In 2014, there were 260 Muslim inmates at the Michael Unit. Tr. Vol. 2 at 531; Def. Ex. 19; Pl. Ex. 67. In 2011, there were 274 Muslim inmates at the

Michael Unit. Tr. Vol. 2 at 531; Def. Ex. 19; Pl. Ex. 67.

(31) As of January 2014, there were 301 female inmates in TDCJ who identified themselves as Muslim, or approximately 2.5 percent of the female inmate population. Tr. Vol. 1 at 95; Def. Ex. 131.

(32) A Hijab is a headscarf worn by Muslim women in observance of their faith. Under TDCJ policy, Muslim women are permitted to own two Hijabs, and they are permitted to wear them throughout the prison facility. Tr. Vol. 1 at 103. A Hijab consists of a piece of cloth which is 40.9 inches by 40.9 inches. Tr. Vol. 1 at 96; Pl. Ex. 68. Muslim women who choose to wear a Hijab must purchase it from a vendor approved by TDCJ. Tr. Vol. 1 at 102.

(33) Of the 301 female Muslim inmates, 59 choose to wear a Hijab. Tr. Vol. 1 at 95. Staffing at female prisons is not based on the religious preferences of inmates or whether they wear a Hijab. Tr. Vol. 1 at 110–11.

(34) Hijabs have not presented a security risk for TDCJ. Tr. Vol. 1 at 130, 200.

(35) Institutional guidelines regarding searches, including guidelines regarding the minimum amount of searches, apply to both female and male prisons. Hijabs can be, and are, searched. Tr. Vol. 1 at 130.

(36) Under TDCJ policy, female inmates are permitted to have long hair, as long as it is neatly groomed. Tr. Vol. 1 at 104. Female inmates are not permitted to have a shaved or partially shaved head. Tr. Vol. 1 at 186.

(37) Identification photographs are taken when an inmate is processed into TDCJ, and then at 5 year intervals. Tr. Vol. 1 at 130. On a case-by-case basis, identification photographs may be taken at less than five-year intervals if the inmate's appearance has changed. Tr. Vol. 4 at 1073.

(38) Female inmates who wear a Hijab take their identification photographs without a Hijab. Tr. Vol. 1 at 131.

(39) An identification card is a plastic card with the inmate's photograph, name, TDCJ number, and date of birth on the front. A magnetic strip on the back or bar code on the front enables machine identification. Pl. Ex. 26 at 1658. The identification card is used for identification, commissary purchases, dispensing medication, issuance of indigent supplies, serving meals, and for other security requirements. Pl. Ex. 26 at 1659. The identification card system is used to maintain a database of inmate front and profile photographs in the Agency Mainframe. Pl. Ex. 26 at 1660.

(40) Each identification card costs TDCJ approximately $3.15. Pl. Ex. 28. An identification card is expected to last for 2 years. Pl. Ex. 26; Def. Ex. 77. Inmates are charged $5 for identification cards that must be replaced in less than 2 years. Pl. Ex. 26; Def. Ex. 77.

(41) Possession of contraband by inmates is one of the largest security issues in TDCJ. Tr. Vol. 1 at 154–55. Contraband can be hidden in any article of clothing, in an inmate's genitals or anus, or it can be swallowed. Tr. Vol. 2 at 240–43.

(42) In 2012, the following contraband was found at the Michael Unit: 39 cell phones, 37 phone chargers, 4 cell phone batteries, 1 SIM card, 14 occasions of money, 25 occasions of tobacco, 23 occasions of marijuana, 76 occasions of weapons, and 28 miscellaneous items of contraband. Tr. Vol. 2 at 534; Pl. Ex. 43; Def. Ex. 24.

(43) In 2013, the annual cost of disposable razor blades was $2.52 per inmate. Pl. Ex. 31.

(44) Inmates are permitted to keep disposable razors, except prisoners assigned to administrative segregation who are required to return the razor after using it. Tr. Vol. 2 at 249.

(45) A pair of clippers without clipper blades costs TDCJ $64.95. Pl. Ex. 31.

(46) The Michael Unit is authorized to have 576 full-time correctional officers and 39 part-time correctional officers. Pl. Ex. 49. As of the time of trial, 495 of the full-time positions were filled and 31 of the part-time positions were filled. Tr. Vol. 3 at 752; Def. Ex. 52. The numbers for authorized correctional officers do not include any higher-ranking officers or other prison employees Tr. Vol. 3 at 756.

(47) There are a certain number of Priority 1 positions that must be filled every day. Tr. Vol. 2 at 518–20. There are 51 Priority 1 positions on the day shift at the Michael Unit and 52 on the night shift. Tr. Vol. 2 at 521. On occasion, other programs must be canceled for the day to fill the Priority 1 positions. Sometimes, correctional officers are paid overtime to cover the positions. Tr. Vol. 2 at 518–20.

(48) The staffing formulas in TDCJ are based on the design, custody, and mission of the facilities. Tr. Vol. 2 at 264. There are more prisoners per correctional officer at TDCJ's male prisons than female prisons, regardless of whether you consider authorized positions or filled positions. Tr. Vol. 2 at 261–62.

(49) Prisons across the United States are rarely staffed at 100 percent of authorized positions. They typically are staffed at 90 to 95 percent of authorized correctional officers. Tr. Vol. 2 at 301.

(50) Staffing shortages can affect the building schedule and cause programs to be canceled. Tr. Vol. 2 at 522–23.

(51) The total operating budget for TDCJ is $3.1 billion for 2014. Tr. Vol. 2 at 376; Pl. Ex. 14 at 1484.

(52) For fiscal year 2014, TDCJ had 26,112 authorized correctional officer positions. Tr. Vol. 2 at 382; Def. Ex. 50. As of February 2014, 22,903 of those positions were filled. Tr. Vol. 2 at 381; Def. Ex. 50.

(53) The average hourly wage of a correctional officer in TDCJ is $16.66. Pl. Ex. 19 at 1295.

(54) Under TDCJ policy, inmates may be denied religious devotional items if they misuse them or if they present a security risk based on documented behavior. Def. Ex. 6.

(55) It takes a chaplain approximately 15 minutes to process an inmate's request to change his religious preference. Tr. Vol. 3 at 668. Inmates are allowed to designate a religious preference during the intake process, and then once at any time. After they change their religious preference the first time, inmates are only allowed to change their religious preference once per year. Tr. Vol. 3 at 645.

(56) The average hourly wage of a prison unit chaplain is $19.60. Pl. Ex. 18 at 1292.

(57) Beards and Kufis do not help an inmate breach a fence. Tr. Vol. 2 at 270–71.

(58) When an inmate escapes from TDCJ, the Office of the Inspector General (OIG) assembles a bulletin that is released to local law enforcement. The bulletin has a description of the inmate, the crime for which he was incarcerated, and any information that would help locate the inmate. Typically, there is one photograph on the bulletin, and the inmate's TDCJ identification photograph is the one that is used. Tr. Vol. 3 at 779–80.

(59) The OIG opens approximately 5,000 cases each year; the majority of those cases are investigations of criminal acts by inmates. Tr. Vol. 3 at 811. In most of those cases, the identity of the perpetrator is known. Tr. Vol. 3 at 811–12. When the perpetrator is not known, the OIG assembles a photographic array to try to identify the inmate. The OIG conducts approximately 20 photographic arrays each year. Tr. Vol. 3 at 811–12.

(60) An inmate who is in compliance with the grooming policy can alter his appearance by changing hairstyles or hair color, by wearing a cap or taking one off, and by growing facial hair. Tr. Vol. 2 at 273–75; Tr. Vol. 3 at 591–92; Tr. Vol. 3 at 806; Def. Ex. 30; Def. Ex. 32.

(61) The Texas Department of Criminal Justice chooses to follow the Texas Establishment Food Regulations (TEFR), although the agency is not required to comply with those regulations. Tr. Vol. 4 at 970. To ensure that food is free from hair, TDCJ requires hair nets or hats to be worn within the food service area. Tr. Vol. 4 at 971; Def. Ex. 78. Food service employees wearing nail polish or fake nails are required to wear gloves. Def. Ex. 78. An inmate with a beard would be required to wear a beard guard. Tr. Vol. 4 at 974. A disposable beard guard, which is worn for a single shift, costs $0.03. Tr. Vol. 4 at 975; Pl. Ex. 21 at 2150. Approximately 6,600 inmates work in the prison kitchens operated by TDCJ. Tr. Vol. 4 at 971. There are 283 food service employees at the Michael Unit. Tr. Vol. 4 at 972; Def. Ex. 79.

(62) Inmates with clipper shave passes are not required by TDCJ to wear beard covers if they work in the kitchen. Tr. Vol. 4 at 982.

(63) During inmate searches, the procedure requires inmates with longer hair to shake out their own hair with their fingers. Tr. Vol. 2 at 258; Tr. Vol. 3 at 557. If the inmate has short hair, the correctional officer will often do a visual inspection. Tr. Vol. 3 at 557.

(64) An average pat down search takes 7 seconds. Tr. Vol. 4 at 1042. A search of a full beard takes up to 5 seconds. Tr. Vol. 4 at 1042–43. A search of a Kufi takes 3 seconds. Tr. Vol. 5 at 53. On average, a TDCJ inmate would be searched 4 times each day. Tr. Vol. 4 at 1044.

(65) Inmates who are in administrative segregation or have a custody status of G–5 must be strip searched whenever they leave their cell. Tr. Vol. 4 at 1046. Administrative segregation is a restrictive classification where inmates typically only come out of their cell for recreation and to shower. Tr. Vol. 3 at 843.

(66) Inmates in TDCJ are counted 8 times each day. Tr. Vol. 3 at 549.

(67) There are 96 pending lawsuits filed by inmates seeking religious exemptions to TDCJ's grooming policy. Tr. Vol. 3 at 671; Def. Ex. 48.

(68) The Muslim population in TDCJ has decreased every year since 2011, when a Muslim inmate was granted an injunction allowing him to wear a quarter-inch beard in *Garner v. Livingston*, 2011 WL 2038581, at *2 (S.D.Tex. May 19, 2011). Tr. Vol. 3 at 681–84.

(69) There are 4 designated Jewish prison units in TDCJ Tr. Vol. 3 at 698. One of those units, the Stringfellow Unit, operates a kosher kitchen for Jewish inmates. Tr. Vol. 3 at 698. It costs nearly twice as much for kosher meals as regular meals—approximately $6 per inmate per day for kosher meals and $3 for regular meals. Tr. Vol. 3 at 700.

(70) Inmates who sincerely practice their religion are less likely to violate pris-

on rules than other prisoners. Tr. Vol. 2 at 309; Tr. Vol. 3 at 729–30; Tr. Vol. 5 at 19–20; Kugler Deposition at 15–16; Pl. Ex. 61.

(71) Four inmates have escaped from TDCJ since 2011. Tr. Vol. 3 at 815.

(72) here are 12 security threat groups in TDCJ. Confirmed members of 7 of those groups are assigned to administrative segregation upon identification because they pose a threat to the safety of the unit, staff and other inmates. Members of the other 5 security threat groups and gang members are confined in general population. Tr. Vol. 842–45.

(73) The court finds that the Plaintiff's expert witnesses, Mr. George Sullivan and Mr. Roy Timothy Gravette, are more credible than the Defendant's witnesses because they both have significant experience working in prisons where beards are allowed and Kufi's are allowed to be worn at all times.

### Legal Standard

■■■ The RLUIPA, in part, protects the religious rights of institutionalized persons who require government permission and accommodation to practice their religion. *Cutter v. Wilkinson,* 544 U.S. 709, 721, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005). The statute prohibits a government from imposing a substantial burden on a prisoner's religious exercise, even if the burden results from a rule of general applicability, unless the government demonstrates [2] the burden is: (1) in furtherance of a compelling governmental interest; and (2) the least restrictive means of furthering that interest. 42 U.S.C. § 2000cc–1(a).[3] Cases brought pursuant to the RLUIPA require a "fact-specific inquiry that takes into account the special circumstances of the individual prisoner and prison." *Chance v. TDCJ,* 730 F.3d 404, 411 (5th Cir.2013). The court must give due deference to the expertise of prison officials in establishing regulations and procedures to maintain order, security and discipline, taking into consideration costs and limited resources. *Cutter v. Wilkinson,* 544 U.S. 709, 723, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005). However, there are limits to the deference owed to the judgment of prison officials. *Chance,* 730 F.3d at 419. Otherwise, prison officials could

---

**2.** The RLUIPA assigns the government the burden of going forward with the evidence and of persuasion on whether the policy furthers a compelling governmental interest and is the least restrictive means of furthering that interest. 42 U.S.C. § 2000cc–5(2).

**3.** The Supreme Court has noted that the RLUIPA reinstated the "compelling government interest"/ "least restrictive means" standard set by the Religious Freedom Restoration Act (RFRA). The RFRA was enacted in response to *Employment Div., Dep't of Human Resources v. Smith,* 494 U.S. 872, 878–882, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), in which the Supreme Court held that the Free Exercise Clause is not offended by the enforcement of laws of general application that incidentally burden religious conduct. *See Cutter v. Wilkinson,* 544 U.S. 709, 714–15, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005). The RFRA prohibited a government from substan-

tially burdening a person's exercise of religion unless the government demonstrated that the burden is the least restrictive means of furthering a compelling governmental interest. 42 U.S.C. §§ 2000bb, et seq. The Supreme Court invalidated the RFRA as applied to States and their subdivisions, holding that it exceeded Congress' powers under the Fourteenth Amendment. *City of Boerne v. Flores,* 521 U.S. 507, 532–36, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997).

In response to *City of Boerne,* Congress passed the RLUIPA. *Cutter,* 544 U.S. at 715, 125 S.Ct. 2113. Invoking its powers under the Spending and Commerce Clauses, Congress largely reprised the provisions of the RFRA, but limited its scope to laws and regulations governing land use and institutions, including prisons, that receive federal funds. *Id.; Adkins v. Kaspar,* 393 F.3d 559, 567 (5th Cir.2004).

prohibit all religious practices by citing a generally-applicable policy. *Id.*

The Plaintiff bears the initial burden of proving the challenged government action substantially burdens his religious exercise. *DeMoss v. Crain*, 636 F.3d 145, 150 (5th Cir.2011). The statute defines "religious exercise" as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc–5(7). The RLUIPA does not define "substantial burden," but the United States Court of Appeals for the Fifth Circuit has held that a government regulation places a substantial burden on a religious exercise if it pressures the prisoner to significantly modify his religious behavior and significantly violate his beliefs. *Adkins v. Kaspar*, 393 F.3d 559, 570 (5th Cir.2004). A government regulation does not pose a substantial burden to religious exercise "if it merely prevents the adherent from either enjoying some benefit that is not otherwise generally available or acting in a way that is not otherwise generally allowed." *Id.* Because courts are "ill-suited to resolve issues of theology," the court must not inquire whether a religious practice is central to the adherent's religious belief system. *See Adkins*, 393 F.3d at 570. A plaintiff is only required to demonstrate the "honesty and accuracy of his contention that the religious practice at issue is important to the free exercise of his religion." *Id.* He is not required to demonstrate strict doctrinal adherence to all the standards set by his religious authorities to prove his sincerity. *Moussazadeh v. TDCJ*, 703 F.3d 781, 791 (5th Cir.2012).

If the Plaintiff shows that the challenged government action substantially burdens his religious exercise, the burden shifts to the Defendant to prove a compelling state interest, and that the government action is the least restrictive means of furthering that interest. *DeMoss v. Crain*, 636 F.3d at 150. General statements are insufficient to show that the government has a compelling interest because the government interest must be closely tailored to the policy. *McAllen Grace Brethren Church v. Salazar*, 764 F.3d 465, 472 (5th Cir.2014). The Defendant must explain how burdening the Plaintiff's exercise of religion furthers the compelling government interest. *Id.*

The least-restrictive-means standard places a heavy burden on the Defendant. *Burwell v. Hobby Lobby Stores*, —— U.S. ——, 134 S.Ct. 2751, 2780, 189 L.Ed.2d 675 (2014); *McAllen Grace Brethren Church*, 764 F.3d at 475. The Defendant must provide actual evidence, not conjecture, proving that the policy is the least restrictive means. *McAllen Grace Brethren Church*, 764 F.3d at 475 . "The very existence of a government-sanctioned exception to a regulatory scheme that is purported to be the least restrictive means can, in fact, demonstrate that other, less-restrictive alternatives could exist." *Id.* Prison policies from other jurisdictions may provide some evidence of potentially less-restrictive means, although they do not automatically outweigh the deference given to prison officials who have more knowledge of the operations of their own prisons than outsiders. *Chance*, 730 F.3d at 411.

*Analysis*

## I. Plaintiff's Burden

The Plaintiff bears the initial burden of proving the challenged government action substantially burdens his religious exercise. In this case, the Defendant does not challenge the sincerity of plaintiff's religious beliefs. Tr. Vol. 2 at 496. However, the Defendant asserts that the policies, which prohibit the Plaintiff from

wearing a full-length beard and from wearing a Kufi throughout the prison, do not place a substantial burden on the Plaintiff because he is allowed to practice his religion by attending religious services, possessing religious items, and eating special meals. Tr. Vol. 2 at 498.

Although the Defendant notes that Muslim inmates are allowed to practice their religion in other ways, there is no question that TDCJ policies ban practices that are important to the Plaintiff. *See Sossamon v. Lone Star State of Texas,* 560 F.3d 316, 333 (5th Cir.2009) (rejecting TDCJ's argument that an inmate cannot claim that his religious practice is substantially burdened if TDCJ makes alternative means available for him to practice his religion). For the Plaintiff, wearing a fist-length beard and wearing his Kufi at all times are religious exercises as defined by the RLUIPA. The Plaintiff has sincere religious beliefs that he must wear a fist-length beard and a Kufi at all times, and that his failure to do so constitutes a sin. It is undisputed that the Plaintiff's failure to comply with TDCJ's policies subjects him to disciplinary action. The policies create a substantial burden on the Plaintiff's religious exercise because they force him to choose between following the prison policies or exercising his religious beliefs and facing disciplinary action.

## II. Defendant's Burden

Because the Plaintiff has shown that the polices create a substantial burden on his religious exercise, the burden shifts to the Defendant to demonstrate that enforcing the grooming and religious head wear policies against the Plaintiff furthers a compelling governmental interest, and that the polices are the least restrictive means of furthering that interest.

### A. Kufi

In TDCJ, inmates are allowed to wear a Kufi in their cell and at religious ceremonies. Inmates are not allowed to wear a Kufi in other areas of the prison. Although they are allowed to bring their Kufis to religious services, inmates are not allowed to wear them until they arrive at the location where the service is held.

#### 1. Compelling Interest

The Defendant contends the policy restricting the use of a Kufi furthers TDCJ's compelling interests in maintaining security by allowing for easier identification of inmates and preventing the concealment of contraband. The Defendant also contends the policy furthers compelling interests in containing costs and in the orderly operation of its prisons. There is no question that these are compelling state interests. *Cutter v. Wilkinson,* 544 U.S. 709, 725 n. 13, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005); *Garner v. Kennedy,* 713 F.3d 237, 245 (5th Cir.2013). However, the Defendant must also show that the challenged policy furthers the asserted compelling state interests.

##### a. Security

The Defendant's argument that prohibiting inmates from wearing Kufis throughout the prison aids in the identification of inmates is unpersuasive. Under TDCJ policy, a male inmate can permissibly change his appearance by shaving his head. Caps, which are authorized for certain job positions, also could change an inmate's appearance as much as a Kufi. Female inmates are allowed to wear a variety of hairstyles, except for a shaved head, and Hijabs with no apparent concerns about correctional officers being able to identify them. Wearing a Kufi does not change an inmate's appearance more than the types of head coverings that are currently permitted by TDCJ policies. A Kufi changes an inmate's appearance less

than a change in hairstyle because the Kufi can be removed for identification purposes, if necessary. It might actually be easier to identify an inmate who wears a Kufi, because relatively few inmates would be wearing them.

The Defendant presented evidence that a Kufi could be used to cover tattoos of gang symbols. The Defendant contends that it is necessary for prison officials to be able to see and document the tattoos so they can identify the inmate's gang affiliation or identify the inmate if he commits an offense in the prison. Defendant's Exhibit 31 consisted of 35 photographs of inmates with facial and head tattoos, some of which could conceivably be covered by a Kufi. However, each of the inmates with tattoos that could be covered by a Kufi could have been identified with other facial tattoos that could not be covered by a Kufi. Further, correctional officers can always demand that an inmate remove his Kufi to examine him for tattoos, to document tattoos, or to otherwise identify the inmate.[4]

Mr. Joseph Buttitta, the Director of Investigations for the Office of the Inspector General, testified that inmates committing crimes can be identified by visible tattoos. Of the 5,000 cases opened each year by the Office of the Inspector General (OIG), photographic arrays to identify a perpetrator are only necessary in about 20 cases. In the vast majority of cases, the identity of the perpetrator is known by the victim. Normally, there are witnesses to prison incidents because they take place out in the open. There was no evidence presented that in the remainder of the cases, identification was actually made by a tattoo on an inmate's head.

It is undisputed that an inmate *could* hide contraband in or under a Kufi.[5] As the witnesses repeatedly testified, contraband can be hidden anywhere by inmates—whether it is in their clothing or hidden in body cavities. However, the Kufi may be searched, just as any other item worn by an inmate. Muslim men already are allowed to possess Kufis, to wear them in their cells and at religious services, and to transport the Kufis from their cells to religious services. The Defendant argued that Muslim women are allowed to wear Hijabs throughout the facilities because female inmates do not present the same security risks as male inmates. Although they commit fewer disciplinary offenses on a per capita basis, female inmates still pose a security risk. The evidence shows that female inmates do violate prison rules and they do hide contraband, yet female Muslim inmates are allowed to wear Hijabs, even though they are larger, cover more of the head, and are more amenable to hiding contraband than a Kufi. Finally, despite the access inmates currently have to religious head coverings, the Defendant failed to produce evidence of a single incident where contraband was hidden in or under a religious head covering, or even under a work cap.[6]

4. Mr. Robert Grant, the Program Supervisor for the Security Threat Group Office of TDCJ, testified that it would be just as easy to remove a Kufi to document tattoos as it is to have an inmate remove his shirt or jacket. Tr. Vol. 3 at 852.

5. Although fictional, the court is reminded that, in *The Shawshank Redemption*, Andy Dufresne was able to secrete a rock hammer in his Bible, which he used to dig a tunnel out of prison to effect his escape. No one would ever suggest Bibles should be prohibited by TDCJ.

6. Chaplain Bill Pierce testified that he recalled only two instances of religious devotional items being misused. Gang members used different color rosaries to identify themselves. As a result, TDCJ changed the policy to only allow black rosaries. In an incident at the Terrell Unit, a Native American inmate

None of the Defendant's witnesses had experience in correctional systems that allow Kufis to be worn throughout the prison.[7] The witnesses simply offered their speculation as to what might happen if TDCJ allows Kufis to be worn throughout the prison. In contrast, both of the Plaintiff's expert witnesses spent their correctional careers in prison systems that allow Kufis.[8] Both witnesses expressed the

opinion that allowing inmates to wear Kufis does not adversely affect the security of a prison. Tr. Vol. 2 at 304.

The record reflects that 41 states and the Federal Bureau of Prisons (BOP) allow inmates to wear Kufis. Of those correctional systems, the California Department of Corrections and Rehabilitation (CDCR) and the BOP have comparably large prison populations.[9] Although those prison sys-

was caught with a tattoo needle in his medicine bag. Tr. Vol. 3 at 723–24.

7. With one exception, the Defendant's witnesses were current or former employees of TDCJ. Mr. Ronald Angelone has many years of corrections experience in Virginia, Oklahoma, Texas and Nevada. Mr. Angelone expressed an opinion that Kufis could present security problems in a prison setting, but he did not testify that he has any experience working in prison systems where Kufis are allowed to be worn throughout the prison. Mr. Angelone's testimony was primarily concerned with his experience with beards in correctional facilities.

Mr. Angelone has testified or given a deposition as an expert in seven cases. Pl. Ex. 63. Mr. Angelone has mainly been hired by defendants; he was hired one time on behalf of an inmate. Tr. Vol. 4 at 879.

8. Mr. George Sullivan worked in corrections for over 40 years in Oregon, New Mexico and Colorado. Mr. Sullivan also toured or audited 179 prison facilities for the American Correctional Association (ACA), including prisons operated by the California Department of Corrections and Rehabilitation (CDCR) and the Bureau of Prisons (BOP). He has been hired an expert on prison security in 154 cases, by both plaintiffs and defendants almost equally.

Mr. Roy Timothy Gravette was employed by the BOP for 20 years, starting as a correctional officer and retiring as an Associate Warden. Mr. Gravette worked at BOP facilities in Texas, Alabama, and three other states. Mr. Gravette has been hired as an expert in prison security in 34 cases, and has worked for both plaintiffs and defendants.

9. The Defendant presented a considerable amount of evidence trying to differentiate TDCJ from CDCR and the BOP. Defendant's Exhibit 85 reflects that, in 2014, CDCR had a

prison population of 135,089, with a budget of $8.9 billion in 2014. The exhibit reflects that TDCJ's population was 150,935, with a budget of $3.1 billion. The testimony clarified that the inmate population of 150,935 included inmates confined in private prisons owned, but not operated, by TDCJ. Finally, the exhibit shows the BOP had a population of 173,800, with a budget of $6.9 billion. In fact, Defendant's Exhibit 89 shows that there are 173,726 inmates in facilities operated by the BOP. If you include inmates housed in private facilities and other types of facilities, as the Defendant did for its own inmate population, the total number of federal inmates was 216,265. Def. Ex. 89. Clearly, the BOP has a much larger inmate population than TDCJ, in addition to having a bigger budget.

The Defendant also compared the number of correctional officers employed by the three correctional systems. As of February 28, 2014, TDCJ had 26,112 authorized correctional officer positions, and 22,903 of those positions were filled. Citing Wikipedia, the Defendant asserts that CDCR employed 27,-000 correctional officers as of 2013. The court does not view Wikipedia as an accurate source, as evidenced by the fact that it now reflects that CDCR employed approximately 24,000 correctional officers as of 2013. *Bing Shun Li v. Holder*, 400 Fed.Appx. 854, 857 (5th Cir.2010) (agreeing with the United States Court of Appeals for the Eighth Circuit that Wikipedia is an unreliable source of information). Defendant's Exhibit 85 shows that the BOP requested funding for 20,911 correctional officers for Fiscal Year 2014, but there is no evidence concerning how many positions were authorized or filled. At any rate, it is clear that the BOP has more offenders per correctional officer than TDCJ. The Defendant points out that all BOP employees have been through correctional officer train-

tems allow Kufis to be worn throughout the prison, it does not present a security issue. Kugler Deposition at 5; Greilick Deposition at 6–7; Tr. Vol. 4 at 1118; Tr. Vol. 5 at 15. In the BOP, inmates with Kufis are part of the daily routine, and they do not require additional security measures, metal detectors, or electrical fencing. Tr. Vol. 5 at 14–16. The security concerns expressed by the Defendant, in reality, turn out to be insignificant, and they are not shared by the experts who worked in facilities that allow Kufis.

### b. Prison Operations

There was testimony from defense witnesses that the added time for correctional officers to search Kufis could have an effect on the operations of the prison by causing the facility to get off the building schedule.[10] Multiple witnesses testified about the importance of a prison's ability to stay on schedule. Although the wit-

nesses gave varying estimates about the amount of time it would take to search a Kufi, the most reliable evidence was the in-court demonstration, which took a maximum of three seconds. The testimony at trial established that the Plaintiff is searched up to ten times each day. Thus, it would take a maximum 30 seconds of correctional officer time each day to search the Plaintiff's Kufi if he were allowed to wear it throughout the prison.

The Defendant presented testimony that if the Plaintiff is allowed to wear a Kufi, every other Muslim inmate will also want to wear a Kufi. This testimony was pure conjecture, not based on any studies or surveys conducted by TDCJ. In the experience of Mr. George Sullivan, an expert witness for the Plaintiff, approximately 20 to 30 percent of Muslim inmates choose to wear a Kufi. In TDCJ's experience, only

ing, including BOP attorneys, secretaries, case managers, and filing clerks. However, although those employees are able to respond in an emergency, they are not involved in routine searches and supervision of inmates.

The Defendant argues that TDCJ is not comparable to the BOP and CDCR because those prison systems have electrical fencing and they have more advanced surveillance equipment, such as comprehensive video surveillance, parcel scanners, and more walk-through metal detectors than TDCJ. Mr. Gravette testified that, in fact, the BOP does not have electric fences around each facility. Mr. Eason testified that TDCJ is increasing its own surveillance equipment to improve security, unrelated to whether the Plaintiff prevails in this lawsuit. Mr. Eason testified that TDCJ has installed comprehensive video surveillance in some units, and the legislature budgeted $10 million for additional video surveillance equipment. Mr. Eason testified that TDCJ is currently requesting additional walk-through metal detectors and body orifice scanning chairs, and applying for grants to help pay for them. Mr. Eason also testified that TDCJ is installing some electrical fencing, and that he would like to have lethal fencing because it would pay for itself by

reducing the necessity for staff. Because those improvements are being made prior to a ruling in this case, it is clear that those devices are installed to improve security in general, and they are not necessitated by beards or Kufis.

Mr. Gravette testified that the BOP follows building schedules, houses gang members and violent inmates, investigates prison crimes, and conduct roughly the same amount of pat searches daily. Mr. Gravette also testified that the BOP has not needed additional metal detectors, electrical fencing, staff, or other security measures to accommodate inmates with beards and Kufis.

While there are clearly differences between the prison systems, those differences do not preclude comparisons between the prison systems and how they handle inmates with beards and Kufis. How California and the BOP operate their prisons is not dispositive in this case, but it is certainly informative, and it is evidence that the court may consider.

10. A building schedule is a 24–hour schedule that lists all the prison activities that will occur during the day and the times those activities will occur at the facility. Tr. Vol. 1 at 165.

20 percent of female inmates choose to wear a Hijab. Assuming that 30 percent of the Muslim inmates at the Michael Unit chose to wear a Kufi, it would take an additional 15 minutes of correctional officer time each day to search each inmate wearing a Kufi.[11] Even assuming that each of the 260 Muslim inmates at the Michael Unit chose to wear a Kufi, which is highly unlikely, it would take an additional 52 minutes each day for correctional officers to search Kufis. In light of the evidence presented, it is clear that the time required to search Kufis is minimal and would have little impact on prison operations.[12]

### c. Costs

■ Finally, the Defendant argues that the policy prohibiting inmates from wearing Kufis throughout the prison furthers a compelling interest in controlling costs. Controlling costs is certainly a compelling government interest, but in some cases the RLUIPA may require the State to incur some expenses to avoid substantially burdening a religious exercise. 42 U.S.C. § 2000cc–3(c); *Garner v. Kennedy*, 713 F.3d 237, 245 (5th Cir.2013).

The Defendant presented a number of cost estimates for security, but they mainly pertain to the alleged costs for beards.

The only expense directly related to inmates wearing Kufis is the time needed to search them. Given that it would only take 30 seconds each day to search the Plaintiff's Kufi, or 15 minutes each day to search the other Muslim inmates, additional staff would not be needed to conduct those searches because the search time would almost certainly be absorbed by existing staff members. Even assuming additional staff was hired, it would cost $0.14 per day for correctional officers to search the Plaintiff's Kufi and $4.20 to search other Muslim inmates at the Michael Unit, assuming 30 percent of them chose to wear Kufis. This corresponds with Mr. Sullivan's opinion that any added cost from allowing Kufis would be insignificant. Tr. Vol. 2 at 304–5.

### 2. Least Restrictive Means

Although the court finds that TDCJ's policy prohibiting Muslim inmate's from wearing a Kufi throughout the prison does not further a compelling governmental interest, it is worth noting that there are less-restrictive alternatives. Whether a prison policy is the least restrictive means of furthering a compelling government interest is a case-specific inquiry, which means the court must determine if the burden on *that* person is the least restric-

---

11. The Plaintiff is searched more often than most inmates because he lives in a dormitory outside the prison walls, but works inside the walls in the law library, and he is searched when entering housing areas to deliver legal materials. The average inmate is searched four times each day.

12. There was no evidence presented concerning the number of correctional officers it takes to fully staff the Michael Unit. There was evidence about Priority 1 positions, which must be filled even if correctional officers have to be shifted from other assignments. There are 51 Priority 1 positions on the day shift and 52 at night. Obviously, it takes more correctional officers to fully staff

the Unit, but, assuming only the Priority 1 positions are staffed, that is 74,160 minutes of correctional officer time each day. Correctional officers would spend only a small fraction of that time searching Kufis.

The Defendant would argue that the effects of a ruling for the Plaintiff will extend beyond the Michael Unit. While it is possible to calculate the amount of time required to search inmates with Kufis for all of TDCJ, there is no evidence in the record for the court to determine the amount of correctional officer hours worked state-wide on a daily basis. Without that information, it is not possible to determine the actual burden on correctional officer time.

tive means of furthering *that* compelling interest. *Chance*, 730 F.3d at 411.

It is the Defendant's burden to prove that TDCJ's policy is the least restrictive means among available, effective alternatives. *Moussazadeh v. TDCJ*, 703 F.3d 781, 795 (5th Cir.2012). From the record before the court, it appears that TDCJ never seriously considered whether there were less-restrictive alternatives to the current Kufi policy that would accommodate the Plaintiff's religious exercise. None of the Defendant's witnesses testified that they examined the existing policy or considered possible alternatives to the policy.[13] There were no exhibits showing the issue was studied by TDCJ or that alternatives were considered. The Defendant's expert witness, Mr. Angelone, testified that, in forming his opinions, he did not consider whether there were any less-restrictive alternatives to the policy. Tr. Vol. 4 at 942–43, 945–48. Thus, the Defendant's argument that the Kufi policy is the least restrictive means seems to be a post hoc rationalization justifying the current policy, rather than a decision made by prison officials after a thoughtful examination of the issue.

There are currently procedures in place in TDCJ to keep track of inmates who are permitted to have Kufis. If a Muslim inmate has a Kufi, it is noted on his property papers in the property room. For some items of property, inmates are issued property slips that they can carry on their person. The Defendant failed to offer an explanation why those property slips, which are issued to inmates for watches and other property, could not be also issued to inmates with Kufis. Also, the chaplain's office keeps track of each inmate's religious designation. If a correctional officer is uncertain whether an inmate is allowed to have a Kufi, the officer can call the chaplain's office to verify the inmate's religious designation. Kufis could be searched during pat searches and strip searches, and inmates can be directed to remove their Kufis for identification purposes, if necessary. Finally, TDCJ could revoke the privilege of wearing a Kufi if an inmate is found guilty after a disciplinary proceeding of abusing the privilege by hiding contraband. These are all less-restrictive alternatives to the current policy.

### B. Fist–Length Beard

The Texas Department of Criminal Justice's grooming policy requires inmates to be cleans-haven. Because this policy substantially burdens the Plaintiff's religious exercise, the Defendant must show that the policy is the least restrictive means of furthering a compelling governmental interest.[14]

#### 1. Compelling Interest

The Defendant contends the policy banning facial hair furthers TDCJ's compelling interests in maintaining security by allowing for easier identification of inmates and preventing the concealment of contraband. The Defendant also contends the

---

**13.** It is worth noting that, according to Chaplain Pierce, Kufis and prayer rugs were prohibited altogether by TDCJ until Muslim inmates filed a lawsuit to enforce their con-stitutional rights. Tr. Vol. 3 at 681.

**14.** The United States Supreme Court has granted certiorari in *Holt v. Hobbs*, 509 Fed. Appx. 561 (8th Cir.2013), to consider whether the Arkansas Department of Corrections' (ADC) grooming policy violates the RLUIPA to the extent that it prohibits an inmate from growing a half-inch beard in accordance with his religious beliefs. *Holt v. Hobbs*, —— U.S. ——, 134 S.Ct. 1512, 188 L.Ed.2d 375 (2014). The Respondents have been enjoined from enforcing the ADC's grooming policy, to the extent that it prohibited Mr. Holt from wear a half-inch beard, until the Supreme Court enters its judgment. *Holt v. Hobbs*, —— U.S. ——, 134 S.Ct. 635, 187 L.Ed.2d 414 (2013).

policy furthers compelling interests in containing costs, and in the orderly operation of its prisons. There is no question that these are compelling state interests, but the Defendant must show that the challenged policy furthers the asserted compelling state interest.

### a. Security

Escapes from TDCJ are rare–only 4 inmates have escaped from TDCJ since 2011. Nevertheless, Mr. Buttitta and Mr. Robert Eason [15] both testified that TDCJ's biggest concern with beards was that inmates could change their appearance after escaping by shaving their beards. After an escape, the OIG releases a bulletin to local law enforcement agencies with a photograph of the escapee, a physical description, and other relevant information. The bulletins typically contain one picture because news media prefer to show one picture and the size of the photographs would have to be reduced to fit two photographs on one page. The Defendant's witnesses also expressed concerns about confusing the public if more than one photograph of an escapee was released. Clearly, prisoners who escape can change their appearance in many ways. An inmate with long-er hair could shave it, or an inmate could wear a hat. Defendant's Exhibit 32 shows examples of escapees changing their appearance by growing their hair, dyeing their hair, growing facial hair and wearing glasses. Because appearances can be changed in so many ways, including by growing beards as seen in the Defendant's Exhibit, banning beards does not further a compelling interest in identification of escaped inmates.

Identification is also important on a daily basis, throughout the facility. Mr. Eason testified that inmates in TDCJ are identified by their identification cards 8 times each day at count and several other times throughout the day. Correctional officers identify the inmates by looking at their faces and then looking at the photograph on the identification card. The Defendant presented testimony that beards can cover identifying features, such as gang tattoos, acne, scars and moles.[16] But their own witness, Mr. Grant, testified that it would be possible to document existing facial tattoos during the intake process if the inmates were clean shaven. Tr. Vol. 3 at 858. An inmate could subsequently get a new facial tattoo after intake, but he

---

15. Mr. Robert Easton is the Correctional Institutions Division Deputy Director of TDCJ.

16. As an example of how inmates can change their appearance after escaping, the Defendant submitted photographs of "The Texas Seven," a group of inmates who escaped from the Conally Unit. Five of the inmates were apprehended after 40 days and 2 were apprehended 42 days after their escape. The photographs consisted of their prison photographs, which were released to the public, showing how they looked before their escape, and photographs of how they looked when they were apprehended. Def. Ex. 32. The photographs reflect that the inmates attempted to change their appearance by growing their hair, dyeing their hair, growing facial hair, and/or wearing glasses.

Mr. Buttitta also testified that one of the inmates, Larry Harper, was identified by a pin point mole visible in his prison photograph that would have been covered if he was allowed to have a beard. Tr. Vol. 3 at 792. In fact, the prison photograph of Larry Harper produced by the Defendant did not show a pin point mole. The Defendant subsequently produced additional photographs of Larry Harper, consisting of autopsy photographs and a sketch made by law enforcement in Colorado based on a citizen's description. Court's Ex. 1–A to 1–D. These photographs showed something on his face near his mouth, which was not visible on the prison photograph purportedly released by TDCJ to the public. Mr. John West from the Office of the General Counsel for the Office of the Inspector General later testified that Larry Harper was not, in fact, identified by a prison photograph showing a mole. Tr. Vol. 4 at 1136–37.

would need to be clean-shaven to get the tattoo and it could be documented before his beard covers it. Tr. Vol. 3 at 863–64. If an inmate grows a beard, a new identification card could be issued with a current photograph, as is done for other inmates whose appearance has changed.

The Defendant contends that contraband could be hidden in an inmate's beard. The Plaintiff presented the credible testimony of Mr. Sullivan and Mr. Gravette that beards do not pose a security problem, and that the Defendant has exaggerated the potential problems. Although contraband is occasionally found in inmates' hair and beards, the BOP and CDCR do not consider it a problem and it is not found frequently.[17] Neither agency provided the Defendant with photographs or reports of contraband found in beards. They only provided photographs of inmates hiding contraband in braided hair and dreadlocks.[18] There may well be security issues associated with those hairstyles, but braids and dreadlocks are not at issue in this case.

When Mr. Angelone was the Director of the Virginia Department of Corrections, he changed the grooming policy to require male inmates to be clean-shaven and to have short hair. Mr. Angelone described several incidents that, in his opinion, ne-cessitated the policy change. In one instance, an inmate was killed by his cell mate because he smelled. Spiders were found in inmates' hair. One inmate set fire to his head and was found to have a black widow spider in his hair.[19] These are hygiene issues, unrelated to security issues caused by having beards. Mr. Angelone did not testify as to one example of an inmate hiding contraband in a beard.[20] Further, the court notes that the Virginia Department of Corrections changed the grooming policy to allow inmates to wear a quarter-inch beard after Mr. Angelone retired. Mr. Angelone was the Assistant Director of the Nevada Department of Corrections for 4 years and the Director for 5 years. Nevada allowed beards throughout this time period, and Mr. Angelone did not change the policy when he was in a position to do so. Because Mr. Angelone did not ban beards in Nevada and changed the Virginia policy primarily due to hygiene issues, the court does not find his testimony to be persuasive. The testimony of Mr. Sullivan and Mr. Gravette, who both have extensive experience with beards in correctional facilities, was much more credible.

### b. Prison Operations and Costs

The Defendant asserts that "equity among offenders" is a correctional philoso-

---

**17.** In his notes from his trip to the Federal Correctional Complex in Beaumont, Mr. Eason commented, "Very little contraband is discovered in offender's hair." Pl. Ex. 105.

**18.** The Defendant produced reports of three instances where prisoners concealed contraband in dreadlocks or braids and other instances where law enforcement agencies arrested individuals who were transporting drugs in their hair or under wigs. Def. Ex. 35–37. Mr. Eason testified that prison officials from CDCR gave him a photograph with a cell phone and other contraband hidden in his hair.

**19.** Mr. Angelone also testified that long hair and beards caused problems with lice. This argument is not persuasive. The Defendant's medical expert, Dr. Bobby Vincent, testified that lice is not a problem in TDCJ, beards do not cause lice, and having longer hair does not increase the incidence of lice. Tr. Vol. 3 at 632–334.

**20.** Mr. Angelone did note one instance where an inmate cut his long hair and beard, put the hair on a wax replica he made, left it covered in his bed, and escaped from prison. Tr. Vol. 3 at 899. The inmate was gone for a week or two, but he was apprehended, even though he looked different than before his escape. Tr. Vol. 3 at 899–900.

phy that requires all inmates be treated in the same manner so that nobody is perceived to have a special benefit. In theory, that principle makes sense, but religion is different according to the RLUIPA. Where religious exercise is involved, the practice must be allowed unless banning or limiting the practice is the least restrictive means to further a compelling government interest. In practice, different religious groups are not treated exactly the same by TDCJ. For instance, Native Americans are allowed to have medicine bags, Jewish inmates can be housed in a Jewish-designated unit and eat kosher food, female Muslim inmates are allowed to wear Hijabs, and inmates are allowed to possess religious devotional items specific to their religion.

The Defendant contends it would be difficult to enforce a grooming standard that allows for a certain length beard. While it is possible that inmates would try to exceed the allowed beard length, it is currently the case that some inmates refuse to follow the existing grooming policy.[21]

The Defendant's witnesses repeatedly expressed the opinion that, if Muslim inmates are allowed to wear beards, other inmates will designate their religion as Muslim so they can wear beards. The witnesses referenced incidents in their experience where inmates changed their religious preference to be able to take advantage of a benefit given to a religious group, such as special meals, sweat lodges, and pipe smoking. Although it may have happened in the past, it has not been an issue with respect to beards. To the contrary, the number of Muslim inmates in TDCJ has decreased every year since 2011, when a district court first granted an inmate the right to wear a quarter-inch beard. Mr. Sullivan testified that, in his experience,

approximately 30 to 40 percent of Muslim inmates wore beards. Further, Mr. Foxworth testified that most inmates comply with the grooming standards because of the heat in TDCJ's prisons. Based on the record before the court, there is no evidence that inmates will change their religious preference to wear a beard.

Chaplain Billy Pierce, the Director of Chaplains for TDCJ, testified that it would be necessary for the chaplaincy department to spend a considerable amount of time generating a daily roster of the Muslim inmates who are permitted to wear a beard so the security staff would know who has a religious exemption to the grooming policy. No explanation was given why inmates with religious exemptions to the grooming policy would need to be treated any differently than the 6,615 inmates who have clipper shave passes. The medical department issues clipper shave passes for inmates who have medical reasons for not shaving. Those passes are carried on the inmate's person, and there is apparently no need for a master list of those inmates. Religious exemptions could be handled in the same manner.

Chaplain Pierce also testified that inmates who are Roman Catholics, Jewish, Messianic Jews, non-Roman Catholic Christians, Sabbatarians, Druids, Mormons, offshoots of Islam, and New Omianism would also have a religious basis to request an exemption from the grooming policy. Chaplain Pierce's estimate that 125,000 inmates will request religious exemptions to TDCJ's grooming policy is purely conjecture. Once again, TDCJ failed to conduct any meaningful inquiry as to how many inmates realistically would request to wear a beard for religious reasons. There are no studies or surveys of

---

**21.** In 2012, male inmates committed 6,658 violations of the grooming policy. Those disciplinary cases cost TDCJ $304,229 to process.

inmates, simply a worst-case scenario based on nothing but speculation. What is undisputed is that, three years after the district court decision in *Garner*, there are 96 pending lawsuits filed by inmates seeking religious exemptions to the grooming policy, and there is no indication that any of those inmates changed their religious preference to obtain a religious exemption.

The Defendant's claims concerning the anticipated costs of changing the beard policy are grossly exaggerated, primarily because the Defendant makes the assumption, unsupported by the evidence, that all inmates would grow a beard or change their religion to be allowed to grow a beard. The most egregious example of over-inflating costs was the Defendant's estimate that it would cost $117 million to install lethal fences around all TDCJ prison units.[22] There was no testimony that TDCJ would actually install such fences if the Plaintiff or other Muslim inmates were granted injunctions allowing them to wear beards. Nor was there testimony that lethal fencing is necessary for security reasons if inmates are allowed to wear beards. Actually, Mr. Eason testified that electric fences are a good security device, in general; and there was testimony that TDCJ has begun installing stun fences around some of its units, apparently unrelated to this case.

The record is full of examples of over-estimated costs. The Defendant's cost estimates for building and supplying additional barbershops to accommodate Muslim inmates trimming their beards were not tied to any realistic projection of increased demand. Rather, the predictions were based on the amount of space available to add barber chairs and the assumption that the vast majority of TDCJ inmates would grow a beard. It is possible that TDCJ would need to purchase additional clippers to trim fist-length beards, but it is impossible to determine how many from the record before the court.[23] Mr. Easton testified he believed it would be necessary to hire 6 to 8 additional correctional officers at the Michael Unit to escort administrative segregation inmates to the barbershop. Again, this estimate was based on the assumptions that all offenders would choose to wear a beard, and it is mere speculation.[24]

Likewise, the estimated costs for beard covers for kitchen workers assumed that all kitchen employees would need a beard cover. The actual costs, from the evidence presented, are much less. The Plaintiff in this case would not require a beard cover because he does not work in the kitchen. Assuming that 4.5 percent of the 283 inmates assigned to the kitchens at the Michael Unit were Muslim, there would be roughly 13 Muslim inmates working in the kitchens. Even if those 13 inmates worked every meal and wore fist-length beards,[25] they would only require 39 beard covers each day, at a total cost of $1.17 per day.

There are other costs associated with allowing the Plaintiff, or other Muslim inmates to wear beards, but the RLUIPA may require the State to incur some ex-

22. The estimate included the costs of installing lethal fences around women's facilities.

23. The cost of purchasing clippers would be offset, at least in part, by the savings from reduced purchases of disposable razors.

24. The barbershop and clipper estimates were also based on the need to trim beards to a

quarter-inch. Since a quarter-inch beard is no longer an issue in this case, the estimates are largely irrelevant.

25. Inmates with medical clipper shave passes do not wear beard covers in the kitchen, even though they may have facial hair as long as a quarter-inch.

penses. As far as searches of beards, it would take 50 seconds each day to search the Plaintiff's beard, at a cost of $0.23. If 40 percent of Muslim inmates choose to grow a beard,[26] it would take 34 minutes each day to search their beards, at a cost of $9.52 each day. Of course, these cost estimates are only valid if additional staff is actually hired. If the existing staff conducts the searches, there is no added cost. The cost to update the Plaintiff's identification card with a current photograph would be $3.15. The cost to update identification cards for 40 percent of male Muslim inmates in TDCJ would be $20,304. These expenses are only a small fraction of TDCJ's $3 billion budget.

### 2. Least–Restrictive Means

As with the Kufi policy, Mr. Angelone testified that he did not consider any possible alternative to TDCJ's beard policy. Mr. Eason testified that he toured the TDCJ unit at Tennessee Colony, the Folsom prison facilities in California, and the BOP facility in Beaumont, Texas to consider the feasibility of allowing inmates to wear quarter-inch beards as a less restrictive alternative to the current policy. Although prison officials from CDCR and the BOP told Mr. Eason that they do not have problems with their policy, Mr. Eason does not believe beards could be accommodated for Muslim inmates in TDCJ. Mr. Eason did not explain why less restrictive means would not be workable in TDCJ; his testimony focused on differences between the prison systems that would justify TDCJ's decision to maintain its current no-beard policy. Once again, the Defendant's evidence concerning least-restrictive means is more of an attempt to defend TDCJ's current no-beard policy than an unbiased examination of potential alternatives.

In fact, there are alternatives to the current no-beard policy. Taking an intake photograph with the inmate clean-shaven would reveal identifying marks and tattoos that could be covered by a beard. A new photograph could be taken if an inmate grows a beard. Maintaining copies of all prison photographs, which TDCJ currently does, would ensure that the agency has photographs of inmates with a beard and without.[27] During a search, the correctional officer could visually inspect an inmate's beard. If there is any concern that contraband might be in the beard, the inmate could be directed to run his fingers through his beard, as is done with searches of hair. The Department of Criminal Justice could issue a pass, similar to the clipper shave pass, to Muslim inmates who are permitted to wear a beard. Finally, TDCJ could revoke the privilege of wearing a beard if an inmate creates a security risk by abusing the policy.[28]

### Conclusions of Law

(1) Wearing a fist-length beard and wearing a Kufi are religious exercises.

(2) The Plaintiff sincerely believes that he must wear a fist-length beard and that he must wear a Kufi at all times.

(3) The Texas Department of Criminal Justice's policy prohibiting inmates from

---

26. The estimate that 40 percent of Muslim male inmates would wear a beard is based on Mr. Sullivan's experience that 30 to 40 percent of inmates wear beards.

27. Mr. Eason testified that inmate photographs are updated every five years, or in some cases more frequently if an inmate's appearance has changed. Tr. Vol. 4 at 1072–73.

28. The Defendant contends that this is not a viable option if an inmate has an injunction allowing him to wear a beard. This argument ignores the fact that such a policy could have been considered and/or implemented prior to litigation.

wearing a Kufi throughout prison facilities substantially burdens the Plaintiff's religious exercise.

(4) The Texas Department of Criminal Justice's grooming policy, which prohibits inmates from wearing a beard, substantially burdens the Plaintiff's religious exercise.

(5) The Texas Department of Criminal Justice has compelling interests in maintaining security, containing costs, and in the orderly operation of its prisons.

(6) The Texas Department of Criminal Justice's policy prohibiting inmates from wearing a Kufi throughout the prison does not further TDCJ's compelling interests in maintaining security, containing costs, or in the orderly operation of its prisons.

(7) There are less-restrictive alternatives to the current policy prohibiting Muslim inmates from wearing a Kufi throughout the prison units, such as: calling the property officer or the Chaplain's Office to see if an inmate is permitted to have a Kufi; issuing the inmate a property pass authorizing him to wear a Kufi to keep on his person; having an inmate remove his Kufi for identification purposes, if necessary; having the inmate remove the Kufi to be searched during strip searches and pat searches; and revoking the privilege of wearing a Kufi if it has been misused in a manner that affects security.

(8) The Texas Department of Criminal Justice's policy prohibiting inmates from wearing a fist-length beard throughout the prison does not further TDCJ's compelling interests in maintaining security, containing costs, or in the orderly operation of its prisons.

(9) There are less-restrictive alternatives to the current policy prohibiting Muslim inmates from wearing a fist-length beard, such as: taking an intake photograph with the inmate clean-shaven and then taking a new photograph and issuing a new identification if an inmate grows a beard; maintaining copies of all prison photographs; searching the beard by having an inmate run his fingers through it; issuing a pass to Muslim inmates who are permitted to have a beard; and revoking the privilege of wearing a beard if it is abused.

(10) The Plaintiff is entitled to a declaratory judgment that the TDCJ policy regarding religious head wear, which prohibits him from wearing a Kufi throughout the prison, imposes a substantial burden on his religious exercise, is not justified by a compelling governmental interest, and is not the least restrictive policy.

(12) The Plaintiff is entitled to an injunction restraining and enjoining the Defendant from enforcing the TDCJ policy regarding religious headwear in such a way that it violates the Plaintiff's rights under the RLUIPA. ·

(13) The Plaintiff is entitled to a declaratory judgment that the TDCJ grooming policy, which prohibits him from wearing a fist length beard, imposes a substantial burden on his religious exercise, is not justified by a compelling governmental interest, and is not the least restrictive policy.

(14) The Plaintiff is entitled to an injunction restraining and enjoining the Defendant from enforcing TDCJ's grooming policy in such a way that it violates the Plaintiff's rights under the RLUIPA.

### Conclusion

The Plaintiff has met his burden of proving that the grooming policy and religious headwear policy substantially burden his religious exercise. The Defendant has not met his burden of proving the policies are the least restrictive means of furthering compelling governmental interests. Therefore, the Plaintiff is entitled to a judgment in his favor, granting declarato-

ry and injunctive relief. A final judgment will be entered in accordance with these Findings of Fact and Conclusions of Law.